IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SARAH CRABTREE, et al., | ) |
| | ) |
| Plaintiffs, | )     NO. 3:08-0939 |
| | )     JUDGE HAYNES |
| v. | ) |
| | ) |
| DAVE GOETZ, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Plaintiffs, Sarah Crabtree, Velma Ledbetter, Carl Anders, George Dylan Brown,

Willowdeen Burrows, Hazel S. Graham, Harold Lee Murphy, Larry Scott Ervin, Megan Allen,

Jessica W. Pipkin, Florence Adams, Lena Burgess, Wilma F. Stills, Odell Owens, Ellar Lowman,

Marvin Ray Berry, Jr., Carol Smith, Betty Jean Taylor, Delores Baker, Lorrinda Mabry, Joel

DeHaas and Margaret Connelly[1] filed this action under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act ("RHA") 29 U.S.C. §

794(a) against the Defendants: David Goetz, Commissioner, Tennessee Department of Finance

and Administration and Darin Gordon, Deputy Commissioner and Director, Bureau of TennCare.

In essence, Plaintiffs assert claims that the Defendants' recent cuts of their home health

care services will result in their forced institutional placement in nursing homes in violation of

the ADA and RHA that prohibit discrimination on the basis of disability, including unjustified

institutionalization  Plaintiffs have disabilities, including cerebral palsy, muscular dystrophy,

traumatic brain injury, Parkinson's disease, Alzheimer's disease, and stroke  With limited

---

[1] Plaintiffs Murphy and Taylor and the defendants agreed to dismiss those Plaintiffs'
claims  (Docket Entry No. 74).

incomes, Plaintiffs receive home health care services through TennCare, Tennessee's Medicaid

waiver program  Plaintiffs satisfied TennCare's former eligibility criteria for these home health

services that were determined to be medically necessary and to represent the "least costly

alternative course of diagnosis or treatment that is adequate." Tenn Comp. R & Regs 1200-13-

16-05(1)(e). The State's eligibility determination also found that these TennCare services would

not supplant family or natural supports. Tenn Code Ann. § 71-5-144(b)(1)  Plaintiffs assert

these drastic reductions of their home health services also force Plaintiffs' doctors to reduce their

orders on the hours of in-home nursing care that the Plaintiffs actually need. Under the

Defendants' current policy, medical necessity no longer requires that the medical services be

medically adequate

Before the Court is the Plaintiffs' motion for a preliminary injunction (Docket Entry No.

2) seeking to enjoin the implementation of these cuts of their in-home medical services, pending

an individual assessment of their home health needs consistent with federal and state law.

Plaintiffs seek, in essence, to require the Defendants:

> (1) to maintain the status quo and refrain from imposing the across-the-board cuts
> in HH and PDN until the community-based, patient centered system authorized by
> the State's Long-Term Care Community Choices Act is implemented and
> available to Plaintiffs;
>
> (2) to conduct individualized assessments of the Plaintiffs to determine the
> specific needs of each Plaintiff, including the amount of time required to meet
> those needs, and the extent to which family or other natural supports are available,
> and whether the needs could be satisfied in the community at less cost than
> Defendants are presently paying; and
>
> (3) to determine whether nursing homes will in fact provide the services each
> Plaintiff requires

(Docket Entry No. 27, Plaintiff's Reply to Defendants' Memorandum at pp. 11-12).

2

Although the Defendants agreed to suspend implementation of these cuts pending the Court's ruling on Plaintiffs' motion, Defendants assert, in essence, that Plaintiffs lack standing under the ADA and RHA to assert these claims; that these cuts are fiscally necessary as part of a comprehensive State plan for disabled persons; that the Court's consideration of costs cannot be limited to the fiscal impact of the Plaintiff's claims, but upon all disabled enrollees; and that any of the Plaintiffs' medically necessary services can be provided safely by nursing homes. In addition, as a comprehensive plan, the Court must defer to the Defendants' determination on the appropriateness of these benefit cuts.

Plaintiffs respond, in sum, that the costs of nursing home care exceed the costs of their necessary home health services, and that under state law, the cost of the nursing home care can be made available to them to pay for such services in their homes. Plaintiffs also cite the administrative costs of the Defendants' multi-tiered system of Defendants' Managed Care Organizations ("MCO"), the MCO's related contractors and their subcontractors for home health services, as creating unnecessary costs for the delivery of the home health services. For some Plaintiffs, their MCOs provided unnecessary and costly services that those Plaintiffs did not deem necessary for their care.

## A. Findings of Fact

On July 22, 2008 the Center for Medicare and Medicaid Services ("CMS") approved[2] new limits for the TennCare waiver program that reduced home health services effective,

---

[2] Two enrollees filed a discrimination complaint with the DHHS's Office of Civil Rights that has not been resolved. Because DHHS has a designated office for such complaints, the Court finds that CSM's approval of TennCare's revised rates did consider the merits of those discrimination claim

3

September 8, 2008. On August 8, 2008, the Defendants sent a notice to TennCare enrollees of a cap limiting home services to 35 hours a week for combined home health services, including private duty nurses (Plaintiffs' Exhibit No 3). This letter stated, in pertinent part:

**Starting September 7, 2008:**

1. TennCare will **ONLY** cover PDN [Private Duty Nurse] services for adults age 21 or older **IF:**
   - You are ventilator dependent.
   - **OR,** you have a functioning tracheotomy AND need certain other kinds of nursing care too.

**AND**

2. There will be limits on Home Health Care for adults age 21 or older.

This letter is for you because our records show you're age 21 or older.

\* \* \*

**Are you getting these services now?** If so, AND the amount of care you get will change, you'll get <u>another letter</u> from your health plan. That letter will say how much care you will still get. It will also say <u>when those changes will start for you</u>. **AND**, it will tell you how you can appeal those changes if you think we've made a mistake.

**<u>Private Duty Nursing (PDN)</u>**
Starting **September 7, 2008**, TennCare will **not** cover PDN services for adults age 21 or older
**<u>unless:</u>**

- Your are ventilator dependent <u>for at least 12 hours each day</u>.
- **OR** you have a functioning tracheotomy AND need certain other kinds of nursing care too

For your safety, to get Private Duty Nursing, you must have a relative or other person who can:
- Care for you when the private duty nurse is not with you
- AND take care of your other non-nursing needs.

What if you're age 21 or older and **not** ventilator dependent or **don't** have a tracheotomy AND need the other kind of nursing care? TennCare won't cover PDN services for you

4

You may be able to get Home Health Care. **Keep reading to find out about changes to Home Health Care.**

* * *

### Home Health Care

What if you don't qualify for private duty nursing but still need care at home? Your may qualify for **part time** (intermittent) **nursing OR home health aid care**

**Part time and intermittent Home Health Nursing Care**

For <u>most</u> people, TennCare will **only** pay for:
- Up to one nurse visit each day (Each visit must be less than 8 hours.)
- No more than 27 hours of nursing care each week

**Home Health Aide Care**

For <u>most</u> home health aide visits **only** pay for:
- Up to 2 home health aide visits each day
- No more than 8 hours of home health aide care each day.

**What if you need <u>both</u> Home Health Nursing AND Aide care?**

For most people, TennCare will **only** pay for:
- No more than 8 hours of nursing and home health aide care <u>combined</u> each day.
- No more than 35 hours of nursing and home health aide care <u>combined</u> each week

**If you would qualify for care in a Skilled Nursing Home but want to get care at home, you may be able to ger:**
- Up to 30 hours of nursing care each week
- Up to 40 hours of nursing and home health aide care <u>combined</u> each week.

**Important:**

TennCare will **only** pay for nursing services if you need care that can only be given by a nurse (care that can't be given by an aide). This care like tube feeding or changing bandages, TennCare **won't** pay for a nurse if the only reason you need a nurse is because you **might** need to take medicine. The nurse will **only** stay with you as long as you need **nursing** care.

<u>Id</u>

**Plaintiff Florence Mary Adams**

Florence Mary Adams, who resides in Cookeville, Tennessee, is a 21 year old married

woman who has limb-girdle muscular dystrophy. Adams's mother and sister live in Cookeville,

5

but her mother works from 9:00 a.m. until 6:00 p.m. as a waitress. Adams's sister, who is 14, attends school at Lebanon High School that is approximately 45 minutes from Cookeville. Until she was 16, Adams's mother was her full-time caretaker, but for the last five years, Adams has had a combination of her mother and a nurse. Adams cannot prepare her food, but can feed herself once the food is on the table. Adams's husband has myasthenia gravis, a form of muscular dystrophy. Adams's husband is also in a motor wheelchair, but he can walk short distances. Adams's husband cannot pick her up nor turn her nor assist in her toileting needs. Her husband attends Tennessee Tech, full time majoring in mechanical engineering. Adams's husband handles his daily living needs and does not receive TennCare home health services. Adams has a three years old daughter. Adams's child climbs into her lap, but her husband provide for the child's care. Adams is able to take trips, go to the movies and parks.

Adams was diagnosed with muscular dystrophy when she was six and has been in a power wheel chair since she was 11. Adams attended school, but in high school, her sickness precluded a full school day, and a teacher taught her at Adams' residence. Under TennCare, Adams has had nurses since she was 16. In the past, Adams has released her aides to attend activities, but on occasions, the CNA helped her "off the clock." (Docket Entry No. 63, Transcript ("Tr.") at p. 41)

Adams's limited lung capacity causes her to tire very easily and requires her to use a bi-pap machine at night to avoid respiratory infection. This bi-pap machine allows Adams's lungs to expand so she can breathe deeper and maintain her lungs' capacity. Adams who cannot cough, is susceptible to pneumonia and respiratory infection. Adams has to turn every 30 minutes to an hour due to the pains in her sides and hips and turning requires the assistance of a nurse. At one

6

time, Adams had a hospital bed that would inflate with air to assist in turning her without assistance, but that device no longer works because her arms lack the strength to move or to pull herself. Adams's ankles and knees must be moved every 30 minutes and before going to bed and at times during the night. Without these exercises, Adams "suffers a lot of pain" and becomes stiff, making any movement difficult. The turning is also necessary to prevent bedsores and the break down of her skin that can cause ulcers

Until November 2007, Adams had 24 hours care, seven days a week ("24/7") coverage initially by a Licensed Practical Nurse ("LPN") that was later changed to Certified Nurse Assistant ("CNA") The CNA takes Adams to the bathroom, assists her in bathing and brushing her teeth The CNA assists her with a Hoyer lift that places Adams in a wheelchair to bath her The CNA performs the same functions as the licensed practical nurse. In Adams's view, she did not need a nurse provided by the MCO's contractor, only a CNA

Between December 2007 and January 2008, a woman interviewed Adams and determined Adams needed a CNA for only16 hours a day. Adams states that she did not have a time study for her reduced CNA services. Recently, Adams health has deteriorated and she does not sleep well. Adams's lung capacity is now 22 percent, down from 43 percent in January 2008. The pain in her hips and legs awakes her. Adams cannot lift her arms and can lift her head only in the sitting position, but cannot when she is laying down

Defendants announced TennCare's cuts in services in home health in an August 8th letter, Plaintiffs' Exhibit 3 That letter informed Adams that her home health services would be reduced to 35 hours a week Between the August 8th letter and the second TennCare letter issued shortly after the first letter, TennCare reduced Adams hours to 35 hours, but did not assess her actual

7

needs for these services nor did the Defendants do so as of December 2008. Adams appealed

that decision citing her physician's assessment that she needs twenty-four hours of home care

seven days a week. Pending her appeal, Adams's care returned to 24/7 coverage.

After receiving the Defendants' notice of reduction of services, Adams also called

TennCare Solutions, her case manager who responded that if Adams could not survive on the

limited medical services, she would be placed in a nursing home. With prospect of family

separation, Adams called the local mental hospital because she would rather die than to go to a

nursing home. Adams now receives mental therapy and is on medication for her mental health.

Adams explained that if her services were reduced to 16 hours, she "could not go to the bathroom

for a long period of time" and would have to sit without "much help at all." (Docket Entry No.

63, Transcript at p. 39)

Dr. Christopher Rayala who is one of Adams's treating physicians submitted his affidavit

(Docket Entry No. 45) and opines that:

> "Without continued care in her home, Mrs. Adams will have to move to a nursing
> home as staying in her home without any assistance would place her in danger of
> serious infections, urinary tract infections, skin breakdowns, pressure ulcers and
> the like due to her inability to move on her own or toilet on her own and perform
> basic activities of daily living on her own. If Mrs. Adams were forced into a
> nursing home due to a lack of care in her home, her depression and anxiety issues
> would be exacerbated."

Id. at p. 1-2.

Dr. Brenda Butka, who specializes in pulmonary medicine and is a faculty member in the

Pulmonary Division at the Vanderbilt School of Medicine, also opined about Adams's medical

condition and needs:

> Florence Adams is a 21-year old woman who has been my patient for

8

approximately two years. She has muscular dystrophy and is totally dependent for positioning, toileting, feeding, and all aspects of care. She cannot change position in bed without assistance.

She has respiratory insufficiency, and requires someone to place and adjust her BiPap unit throughout the night. Her BiPap unit is acting as a non-invasive ventilator and is required for her health and continued survival.

She requires assistance and someone present 24 hours daily due to these needs. To my knowledge, there is no care for which she requires a licensed nurse. All other needs can easily be addressed by a trained personal assistant or home health aide. However, without care 24 hours a day to address these needs, she will not be able to safely remain in her home.

(Docket Entry No. 44 at p _____ )

Dr. Peter Donofrio, a neurologist specializing in neuromuscular disorders is in the

Vanderbilt University Medical Center, Department of Neurology, also opines about Adams as

follows:

Florence (Carroll) Adams ... is a patient under my care through the Muscular Dystrophy Association Clinic at Vanderbilt University Medical Center.

She has limb-girdle muscular dystrophy, which is severe. I last saw her on July 3, 2008 at which time she had profound atrophy and weakness in the upper and lower extremities, greater in the shoulders and hips than distally. She is wheelchair-bound and is unable to stand or walk effectively.

Mrs. Adams has only slight movement of her fingers and wrist, and no movement of her legs except for slight movement of her knees and ankles. She cannot walk, cannot move her arms or legs on her own, cannot lift or grab items, and cannot turn over by herself when lying down. Mrs. Adams requires assistance with all activities of daily living (ADLs) including preparing and feeding meals, opening doors, transferring from bed to wheelchair, bathing, dressing, toileting, and assistance with personal hygiene.

Mrs. Adams' husband also has muscular dystrophy but his condition is not as severe. He is in a wheelchair but can transfer himself. However, he does not have the strength to lift or transfer Mrs. Adams out of her motorized wheelchair. Mr. and Mrs. Adams have a three-year old daughter who is not disabled.

Of interest, Mrs. Adams was admitted to Vanderbilt University Medical Center in

9

May 2008 for chest pain and shortness of breath. Unfortunately, she continued to have chest pain after she was discharged home. She characterizes the pain as severe, requiring potent analgesics. On my examination she had clear chest wall pain suggestive of costochondritis

Due to her condition, without care 24 hours a day, seven days a week, it will be unsafe for Mrs. Adams to remain in her home.

In my opinion, she should be allowed to remain in her home with 24 hour care which would preclude the necessity of placement in a nursing home where the level of care would not be superior and where she would be separated from her husband and three-year old daughter.

(Docket Entry No. 47 at p. 1-2).

### Plaintiff Marvin Ray Berry, Jr.

Marvin Berry is a quadriplegic who has been confined to a wheelchair since he was a child. Berry is paralyzed from the neck down as the result of a stray bullet that struck him as a child. Berry has been paralyzed over 25 years and has had five or six surgeries requiring hospital stays of a week to two weeks. Berry lived with his mother and two younger brothers who cared for him. Berry's mother who now has degenerative disk disease, back and sciatic nerve problems, cannot assist him any longer. Berry's 19 year old sister cares for his eight year old brother and his mother. Berry's other brother, Jeremy is married with three children, works for Black Box Communication and is head of a cabling division for the southeast United States, requiring out-of-town travel for a least five out of seven days a week.

Berry is on supplemental security income and lives in a Section 8 apartment, that is modified to allow him to access his bathroom, shower and kitchen. Berry controls his wheelchair by a device utilizing radio waves to move his head. Berry lacks movement in his fingers or wrist. Berry needs help washing his face, brushing his teeth and applying lotion to his skin to avoid skin breakdown as well as assistance for his bowel movements. Berry's medication causes his mouth

10

to be really dry, and every 15 minutes, he has to lay back to release pressure. Berry breathes from his diaphragm, but cannot cough nor force anything out of my lungs, without assistance to press his abdomen. Berry attends church and volunteers with Big Brothers and Big Sisters of America. He goes to the movies and out to dinner.

Despite his physical limitations, Berry earned a Bachelor's degree from Middle Tennessee State University where he received assistance from a vocational education agency. Berry now receives 24/7 coverage from TennCare, through a managed care program with four CNAs that work 12 hours shifts. Berry's CNA usually repositions him and turns him on his back and checks his leg bag that collects his urine. The CNA provides Berry with range of motion exercises for his ankles, arms, fingers, and knees that include straightening his legs and raising his legs above his head. Berry has a Hoyer lift to roll him on his side and to lift him into his chair.

Since 2005 Berry had to have surgery for a pressure ulcer that resulted in his hospitalization for three months. Berry has also had one to two urinary tract infections a year. Berry has since been hospitalized on the average one to two times a year for pneumonia that requires intravenous antibiotics and breathing treatments. In November 2007, Benny had a fever with cold chills and based on his experiences these were symptoms of an urinary tract infection. Berry increased his fluid intake and drank cranberry juice, but did not feel better and after a few days went to the hospital. Berry had to have surgery and remains under care for that infection.

Before June 2007, Berry received 12 to 18 hours a day of CNA services. In June of 2007, Berry's case manager from AmeriChoice visited him and explained that because he was living alone, he would be best served with twenty-four hour care of a nurse. Berry deferred to that

11

determination, but Berry opined that he "could get by with 16 to 17 hours a day."(Docket Entry No. 63, Transcript at p.61). After the August 8th letter, Berry received a call on September 16th from Middle Tennessee Home Health, his home health agency that employs separate staffing agency to supply his CNA care needs. A week later, Berry services were cut. Despite Berry's doctor's assessment that Berry needed home care, the State determined that Berry did not meet the definition of medical necessity because he did not need for a skilled nurse, was not on a feeding tube nor respirator nor IV

In his opinion, Berry cannot survive in his apartment on 35 hours a week and stated, "I'm going to be forced to go into a nursing home " Id. at pp. 73-74. Berry lacks any other support systems and a nursing home would change his life and deprive him of his privacy and control over his life  Id. at pp  74-75  Barry would also lose his subsidized apartment and to secure another one would place him on a waiting list

### Plaintiff  Megan Danielle Allen

Megan Allen is 21 and has had cerebral palsy since birth. Allen now lives with her parents who adopted her  Allen needs assistance to dress, bathe, brush her teeth, and to go to the bathroom, as well as her other daily living activities, except for feeding herself  Allen has a lift system at home to assist her in getting out of bed. Allen cannot get a drink of water and needs assistance to sit up and to reposition. Allen can use a computer, but needs assistance with positioning the computer and the voice box  Allen has younger brothers at home, but they also require constant care and one is receiving home health services. Allen's parents who are now older, cannot lift her and have other children who need their care.

12

Allen was an honor student in high school before she entered college in 2006. Before college, Allen's parents provided for her care. Before entering college in January 2006, Allen was evaluated and received training for a voice output device to attend college. The college provided only academic assistance such as a note taker for her classes. Neither TennCare nor any other State agency referred to her to the vocational rehabilitation agency that actually provided her a personal attendant for college. Allen cannot carry or unpack her books. In her first year of college, Allen had home aide services during the day, but not at night. One of Allen's college aides told her that they could not accompany her outside of her dorm and that their hours of service would be reduced to six hours a day from 24 hours a day. Allen experienced problems because in the event of an emergency during the night, she cannot get out of bed nor call for assistance nor go to the bathroom nor turn herself to avoid bedsores. On August 20, 2008, Allen withdrew from college and returned to her parents' home to get the home health services.

In July, 2008, Allen's care required 24 hours per day of home health services. On July 11th, TennCare Select, Allen's provider, notified her that she would be provided only $24,000 or 180 hours per month or approximately six hours per day of services and the August 8th letter announced reduction of her home health services to 35 hours. Allen did not receive any assessment of the time required for her care given her limitations. Allen appealed those restrictions, but those appeals were initially denied for lack of a factual dispute. In July 2008, TennCare Select sent Allen a notice that TennCare would pay for 24/7 services for Allen while her appeal is still pending.

Allen opines that she may be able to do with care less than 24 hours a day, but probably would need care between 12 and 24 hours per day. If Allen cannot continue with 24 hours of

13

home and community aide services, she will be forced into a nursing home. Allen has visited two nursing homes where her aunt and grandmother lived and stated that the homes "stunk" Id. at p.89. Allen also explained that "the thing is, ...then I would be really depressed, because I couldn't go out, I couldn't do anything, and all the time I would get bedsores and get worse and worse and worse, and I would die in the end because the people won't help me." Id. at p.90 As a young adult, Allen wants to be involved in the community, to socialize, to obtain a degree in recreation administration and to live independently Allen was a Junior Miss Wheelchair for two years and visited schools and made public appearance Allen volunteers for Meals on Wheels

On cross examination, the defense counsel elicited that on an out of town visit for a week, Allen's family provided her care and that Allen once had a special bed that she was unable to turn herself, at night. Although Allen receives Medicare and Medicaid, neither TennCare nor her MCO requested this type of bed for Allen

Susan Anderson, a family nurse practitioner, described her work with Allen's medical care over a two year period. According to Anderson, due to spasms and contractures in all her extremities, Allen is quadriplegic with the exception of some voluntary movement of her left arm and hand. Megan is wheelchair bound and unable to walk or stand or reposition herself during the day without some assistance. Although Allen communicates verbally, due to the effects of the cerebral palsy, Allen's speech is slurred requiring voice output device at times. As to Allen's family care options, Anderson stated:

> 5. Megan's mother and father are now retired and have health issues themselves. Mrs. Allen is not supposed to lift anything heavy and Megan is now too large for Ms. Allen to lift and move Mr. Allen can assist some but has medical problems that limit his ability to lift and move Megan. While Megan is at home, her parents do assist with meals for Megan and provide other care that does

14

not require lifting or moving Megan. Also, since Megan is now a young woman and no longer a child, privacy is a greater and more important concern for her

\*   \*   \*

10  Although Megan Allen may meet the criteria for nursing home care, in my opinion, if Megan were to be placed in a nursing home, she would quickly manifest depressive symptoms due to the lack of interaction with peers her age. Due to the lessened assistance she would receive at a nursing home, her endurance would lessen  Supplanting home health aide services with nursing home services may even adversely impact Megan's length of life  Megan Allen does have physical disabilities that the limit her mobility (sic), ambulation and dexterity to perform activities of daily living  However, this should not preclude her from living in the community  Home aid services, personal care assistance and other community services would allow her to stay out of institutions like nursing homes and continue to function in a more integrated community setting. In my opinion, it would be against good medical practice to  prescribe or place Megan Allen in a nursing home facility  However, without home health aide or personal attendant services in excess of six hours per day, Megan may not be left with any choice but nursing home care

(Docket Entry No. 50 at pp. 3-5).

### Plaintiff Miranda Mabry

Miranda Mabry was diagnosed with cerebral palsy at 18 months and needs assistance in her daily living activities, including dressing, bathing and feeding  At some point, Allen qualified for the waiver services to receive a personal attendant for two hours a week which was later increased to eight hours per week before Mabry left her mother's residence. Allen's mother could no longer take care of her and became abusive, causing Mabry to move.

Mabry now receives 24 hours of home aide services, seven days a week  To remain in her apartment, Mabry needs home aide services all the time. Mabry continues to receive other services from the home and community based waiver, including homemaker services once a week, and meals delivery five days a week. A representative of the Defendants asked Mabry to accept 20 hours per week for her personal attendant in lieu of her current home health services.

15

Prior to the threatened cuts in her services, Mabry never received an assessment of the time that her aide needs to assists her in her daily activities. Mabry described her aide as busy most of the time.

Mabry told her provider that she would be unable to remain in her apartment with only 20 to 35 hours of such services each week. At the hearing in this action, Mabry testified that if she had to accept 35 hours of home aide services per week, she would "[g]o [to a] nursing home and die." Id. at p 104. Mabry has visited nursing homes, does not like them and would lose her pet if she moved into a nursing home.

Mabry is a member of the Accessibility Committee for the Council on Developmental Disabilities and serves on the board of an organization called People First and was named Ms Wheelchair Tennessee of 2008. Mabry educates the public on the dignity, productivity and basic values of people with disabilities

### Plaintiff Delores Baker

Timothy Scott Baker, Delores Baker's son, testified about his mother's limitations Delores Baker is a diabetic and is bedridden, requiring 24/7 nursing services to care for all her personal needs Baker's mother needs assistance with meal preparation, bathing, bathroom/dressing, drug administration, maintenance of her catheter, testing of her diabetes, injection of insulin, and other similar services. His mother cannot be left alone safely Before TennCare's 35 hours limitation, Baker never received any assessment of the time required to provide her home health care. When informed of the home health hours cut, Baker called a nursing home where his mother has been on a waiting list for a very long time. On the day before her services were cut, the home services provider told him that when she left off work

16

tomorrow, there would not be anyone to provide service. Baker remained with his mother until her placement into the nursing home.

In the nursing home, Baker related that his mother's catheter had not been flushed nor changed and was full of debris from her kidneys. Despite his request, his mother's catheter was not changed because the nursing home lacked the appropriate personnel to insert a new one. Baker described his mother's clothes and bed sheets as unchanged. Within ten days after arrival, Baker's mother fell and broke her hip, for which she spent three days in the hospital. In 2006, Baker's mother also broke her hip after she fell at home and broke her hip when the nurse was asleep on the couch. **Otherwise**, his mother had never fallen at any time when she had home health care.

Baker's mother's anxiety level is much higher in the nursing home, and she has required increased medications for her nerves. Mrs. Baker does not sleep well because her roommate constantly cries and screams and the **overall** noise in the nursing home. In Baker's opinion, the nurses at the nursing home are overworked and understaffed. At times, his mother has had to use the restroom in her bed and lay in her own waste. Based upon his observations, Baker's mother's health has declined in the nursing home and her mental capacity has worsened to the level of depression.

Baker, a firefighter paramedic, usually works 24 hours on, then 48 hours off. He shops for his mother's groceries, maintains her house, cuts the grass, picks up her medications and catheter supplies, and transports her to the doctor's office. On his off-duty days, Timothy Baker operates a lawn and landscape company, and engages in competitive power lifting. His lawn care

17

business requires seven to eight hours a day. When Baker works the 24 hour shift, no one would be available to care for his mother

### Plaintiff Carl Anders

Dr. Garvin who has been Anders's treating physician for over two years, described

Anders's cerebral artery occlusion in July 2004 that left him with paralysis and hemiparesis on

his left side. As to Anders's limitations, Dr. Garvin testified:

2. [Anders] is unable to walk or transfer. He has extreme difficulties with any movement. He suffers from spasticity, muscle spasms and contractions.

3. . Anders requires feeding and medication administration through a G-tube

4. . Anders was on a trachea and continues to have a stoma site. That stoma site needs daily monitoring for continual discharge and to determine whether the discharge indicates that there is an infection.

5. .. Anders has restriction in his airways. Due to secretions in his airway, he requires constant monitoring about necessary suctioning. He is at great risk of aspiration pneumonia. He has a history of aspiration pneumonia, having been hospitalized many times for it. He was hospitalized for aspiration pneumonia multiple times when he was a resident in NHC nursing home in Milan, Tennessee, and multiple times when he was a resident of the VA nursing home in Humboldt, Tennessee.

6. ... Anders is on a nebulizer twice a day. The nebulizer assists with keeping his airways clear, however, Mr. Anders still needs to be suctioned throughout the day. Some days he needs suctioning every 2-3 hours and sometimes he only requires it once a day. Every day is different and the nurses never know what to expect from him: whether he'll need continual suctioning or just once a day. If Mr. Anders is not suctioned promptly, he chokes and cannot breathe. If he starts choking at his home, his nurse can catch it right away and suction him. **Without constant monitoring, if he chokes, he would be unable to ring his call button to summon assistance. At a nursing home he would be at risk of not being able to breathe.**

7. ... Anders suffers from depression and anxiety and takes Celexa.

18

8. Because of his deteriorating physical and mental health, his sister and mother took him out of the nursing home. He now lives with his mother and sister and his sister's family. They are his caregivers 24 hours a day.

**9. Mr. Anders' medical condition requires constant 24 hour a day, 7 days a week skilled care due to continual suctioning, constant monitoring of his blood pressure, and to hydrate him or feed him every two hours. Mr. Anders is given his medicine through his PEG tube.**

10 ... Anders' nurses move him when he is awake and when he is asleep in bed. He needs assistance with all transfers. The nurses help him to stand each day. If Mr. Anders doesn't move around, he can develop blood clots or pneumonia or other respiratory illnesses. If respiratory illnesses occur, Mr. Anders would have to go to a hospital. Hospitalization for Mr. Anders would be lengthy due to his weakened immune system. If Mr. Anders' private duty nursing is reduced to 5 hours a day, in a very short time, he would end up in the hospital.

**11 ... If ... Anders had to go to a nursing home, very soon afterwards he would be back in the hospital. This was his past history at NHC and the VA nursing home.**

**12. Supplanting private duty nursing with nursing home services may even adversely impact Mr. Anders' length of life. Although Mr. Anders has physical disabilities that limit his ability to be an independent person, he does not require nursing home care. Mr. Anders would not receive the amount or intensity of care in a nursing home that he now receives from private duty nurses. In a nursing home, Mr. Anders would spend most of his time in bed. Private duty nursing allow him to function in a more integrated setting community setting.**

13. In summary, it is my medical opinion that Mr. Anders is medically fragile and requires 168 hours per week of constant skilled nursing care to monitor, assist and do medical interventions for him. It is my medical opinion that a nursing home would not be sufficient for the treatment of his fragile health.

(Docket Entry No. 65-2, Exhibit B at pp. 1-2) (emphasis added).

### Plaintiff Margaret Connelly

Margaret Connelly receives 40 hours of home health care, and challenges the Defendants' assertion of "little risk" to her, if the reduction in services caused her to be institutionalized, given her lack of any family support. According to Connelly,

19

Defendants' statements in their Memorandum in Opposition are incorrect because I do depend on a certified nursing assistant to accomplish most things and a denial in increase of services alone is detrimental; If I also experienced a reduction in services, I would suffer irreparable harm. Currently I depend on other people to prepare my meals and help me eat, give me my medication, help me to dress, and help me into and out of my wheelchair. **A reduction in services will force me into a nursing home as there are no family member's to adequately provide the care that I need, and I have no other resources available**

Docket Entry No. 48, Connelly Affidavit at p. 1) (emphasis added)

### Home Health Care Workers

Plaintiffs presented testimony of home health providers on the implementation of TennCare's recent cuts in services and on the effect of the Defendants' cuts on the Plaintiffs

### Cassie Miller

Cassie Miller, a certified nursing assistant, works for Compassion Home Health that contracts with Middle Tennessee Home Health Providers, that in turn contracts with AmeriChoice, a MCO that contracts with TennCare. Miller was an aide to Marvin Berry, for whom she was "basically his arms and legs." (**Transcript** at p. 107. Miller's only restriction was that she could not give Berry his medicines. For her shift, Miller estimated that she has an hour and a half to two hours of "downtime". Miller testified that before Berry got his letter in August 2008, two people from AmeriChoice visited Berry for ten minutes to check on his patient care needs, but did not perform an assessment of Berry's actual needs. In her opinion, AmeriChoice did not conduct any assessment, but was told Berry his care would remain **at** 24 hours, seven days a week. In Miller's experiences, Berry cannot live independently with home care limited to 35 hours a week.

20

Before her work as a home health aide, Miller worked in two nursing homes for almost five years. Miller described her nursing home work as a "real fast pace" with "extremely high" patient care load of 12 and 18 patients per day. In Miller's opinion, patients with disabilities similar to Berry, "really were not getting the care that they deserved or needed in the nursing home." Id. at p. 109

### Sherry Breeding

Sherry Breeding, a registered nurse, **has worked** for Highland Rim, a home health company for six years. At Highland Rim, Breeding performs case management, clinical supervisory recertifications, admissions, and other duties. As a clinical supervisor, Breeding evaluates patient satisfaction with the staffing agency and determines their health needs. Breeding also works with doctors to obtain any necessary care. Breeding does the intake for referrals to be sure that authorizations are sent for health care services.

Breeding has 58 patients under her supervision, including two Plaintiffs. For these Plaintiffs, Breeding does the recertifications and admissions as well as monthly checks. At times, Breeding provides nursing services such as head to toe assessment, injections, and extractions for laboratory tests. A CNA assists these two Plaintiffs at their homes with their daily living activities, eating, bathing and grooming, but the aides cannot cook meals, transport or accompany patients or perform household activities. CNAs cannot administer medication, but can prompt the patient to take their medication.

As to costs of home health services, Breeding described a home health aide and CNA as performing the same job with different titles. The home health aide actually works with the patient **while** the nurse supervises. According to Breeding, a CNA's compensation depends

21

upon experience and seniority within the company and has pay ranging from $9 to $11 per hour. MCOs, however, charge TennCare a rate of $21 or $22 per hour for CNAs. Part of the CNAs' $21 or $22, the TennCare rate, goes the MCOs and other entities or persons who coordinate the patient's home health services. Licensed practical nurses are paid between $17 to $24 per hour. TennCare pays $35 to $40 an hour for registered nurses. The other part of the TennCare rate goes to the entity that arranges the care. Breeding's agency has entered into such contracts in the past.

As to the proposed TennCare cuts, Breeding learned of these cuts from case managers when the patient's doctor requested an increase in services, but the request was denied due to the upcoming cuts. As to the new cuts, Breeding learned from Dr. Wendy Long, TennCare's Chief Medical Officer, who stated the doctors needed to change their orders for services to conform to the new TennCare cap. Breeding's understanding is that if doctors did not write an order for a lower number of hours, then private duty home care would cease. In Breeding's experience, some doctors refused to write the orders based upon the cap and other doctors wrote orders with a notation that they were being forced to write the order because otherwise their patients would not receive any home care. In Breeding's experience, historically, the treating physician determined the level of home health services with recommendations from the on-site-nurses, but now the MCOs decide the patient's needs. Now, the MCO decides based upon the patient's insurance coverage, but the doctor writes the orders. Breeding also disagreed with Dr. Wendy Long, TennCare's medical director that the doctors write orders for patient case based upon the patient's insurance coverage. Breeding cited a patient whose doctor wrote orders for home care

22

service, unaware that the patient had limited coverage and the patient's nephew paid for the uncovered services.

In Breeding's opinion, her two Plaintiffs cannot survive with the 35 hours limitation. One is 97 years old and does not sleep through the entire night. She has to get up to use the bathroom, as she is on Lasik, a diuretic. Although this Plaintiff has 10 children, who are alive, Breeding has only seen two daughters, one of whom lives next door. Yet, that daughter had back surgery, and her husband has Alzheimer's. Breeding cited another patient whose hours were cut and she was placed in the nursing home the next day. Breeding is aware of only one instance where AmeriGroup performed an individual assessment of their patients under her supervision, and that assessment was only a mental assessment.

When asked for her opinion, based upon her experiences with patients, on the effect of the Defendants' 35 hours a week limitation for patients with doctor's orders for 24/7 care, Breeding opined:

> I think there are many patients that aren't going to want to go to the nursing home because of what you heard earlier. So they are going to stay at home, and they are going to lay in their feces and lay in their urine. But if they go to the nursing home, they are in the same situation. The doctors – some of the doctors won't write orders now for me, because I've asked them so many times to write the decrease, and I was told that I needed to get new orders again from them after the initial orders.

(Docket Entry No. 63, Transcript of hearing at p. 141.) Yet, Breeding acknowledged that the impact must be determined by person, but each individual needs a very thorough assessment.

### Declaration Thomas Jenkins, M.D.

Dr. Thomas Jenkins, a physician and family practitioner who treats TennCare patients

23

submitted his affidavit on the Defendants' and MCOs' administration of these benefit cuts in

which his patients were threatened with loss of all benefits, if he wrote orders for benefits above

the TennCare cut. According to Dr. Jenkins,

> 2. I treat TennCare patients who have been receiving and who continue to need
> extensive home nursing services because of serious chronic medical conditions. I
> have prescribed care for them based on their medical needs. Until this month,
> TennCare and its MCOs have agreed that the care I prescribed for these patients
> was medically necessary and has paid for that care.
>
> 3. I was informed on September 10, 2008 by AmeriChoice, a TennCare HMO,
> that I needed to alter all orders for home health for my TennCare patients. They
> told me that a new prescription had to be written to be consistent with the new
> quantitative limits for home health imposed by TennCare.
>
> 4. I was told if I did not change the orders immediately my patients would go
> without any care at all, beginning Monday, September 22, 2008.
>
> 5. I talked to Betty Watkins, a staff person at AmeriChoice by phone on
> September 10, 2008. I asked if she was asking me to lie about my patients' needs.
> She responded that if I did not agree to change the orders AmeriChoice would not
> pay for any home health care for my patients.
>
> 6. I requested that she put this in writing. When I did not get the information in
> writing, I contacted Dr. Paul Stumb at AmeriChoice on September 12th and 17th.
> Dr. Stumb told me that he had written the instructions 5 different way and that his
> "lawyers would not approve" any of their versions. He said I would not get
> anything in writing, but that I still must prescribed less that the limits, or my
> patients would get not home nursing care at all.
>
> 7. After these conversations, I called my malpractice insurance carrier, State
> Volunteer Mutual Insurance Company (SVMIC). I asked them what I should do,
> given the threat of TennCare HMO and my concern for my patients' safety if they
> get less care than what I have prescribed, and that TennCare has recognized as
> medically necessary.
>
> 8. The insurance carrier's representative advised me to write the new order as
> directed by the HMO, but to sign my orders under duress and to state if I did not
> sign my patients would get no care at all.
>
> 9. I have many patients for whom insurance companies impose quantitative
> limits. Those limits do not change their medical needs nor my prescriptions for

24

care. It may and does impact the services they receive, but **in 34 years of medical practice I have never been asked to misstate a patient's needs or alter a valid prescription in order to come in line with HMO quantitative limits**

(Docket Entry No. 54, Exhibit 6 at pp. 1-3).

### Kelly Dunn

Kelly Dunn is the regional private duty director for Suncrest Home Health of

of Middle Tennessee, LLC that provides home health and private duty nursing services to

approximately 75 TennCare enrollees in Middle Tennessee. According to Dunn, when TennCare

began implementation of the new benefit limits for home health and private duty nursing,

Suncrest Home Health had concerns that unless the TennCare enrollee's treating physician

prescribed the new benefit limits, Suncrest and its providers may be breaching professional

standards of care

> Specifically, Suncrest Home Health could not afford to continue to provide service above the new benefit limits that TennCare would no longer reimburse under the new benefit limits. At the same time, Suncrest Home Health was concerned that if it only provided care up to the amount provided under the new benefit limits notwithstanding an outstanding prescription for a greater amount of care from the treating physician, Suncrest Home Health might not be in compliance with state regulations and might have potential exposure associated therewith.

> Because of these concerns, Suncrest Home Health decided that it could not provide home health and/or private duty nursing to TennCare enrollees absent a prescription from the treating physician that complied with the new benefit limits. We communicated our views on this matter to the managed care organizations with which Suncrest Home Health contracts to serve TennCare patients (AmeriChoice, AmeriGroup, and TennCare Select).

> In order to implement a smooth transition for those TennCare patients who had been receiving home health and/or private duty nursing benefits above the limits, Suncrest Home Health has told case managers who did not have a new prescription in compliance with the benefit limits that Suncrest

25

Home Health would be willing to contact the treating physician to obtain a new order if the physician believed that to be appropriate.

(Docket Entry No. 60 at p. 1-2).

## Defendants' Proof

### Darin Gordon - Fiscal Issues

In his affidavit, Darin Gordon, TennCare's director, related that prior to the State's recent cap on private duty nursing services ("PDN") and home health services (HH"), TennCare offered PDN/HH benefits up to and including 24 hours a day, seven days a week. (Docket Entry No. 39, Gordon Affidavit at p. 1). In the fall of 2007, the TennCare Bureau surveyed the PDN/HH benefits in other States in the Southeastern United States. The Defendants concluded that Tennessee's unlimited PDN benefit was more generous than all but one of the twelve Southeastern States. Id. at p. 2. According to Gordon, Tennessee's spending on PDN and HH increased from $18 million ($6 million State funds) in fiscal year ("FY") 2000,[3] to $313 million ($113 million State funds) in FY 2008. Gordon projects an increase to $447 million ($161 million State) in FY2009, starting July 2008. Gordon cites PDN and HH services as the fastest growing cost driver in the entire TennCare program. Id. at p. 4. Gordon attributed the most significant increase in PDN and HH to the population age 65 and over, for whom expenditures were $454,000 in FY1999 and $81.3 million in FY 2007, and $108 million in FY2008, an increase of three percent of the total HH/PDN expenditures to 35 percent. Id. at pp. 4-5.

---

[3]Because the federal government "matches" Tennessee State Medicaid expenditures, generally at a ratio of 64 percent federal/36 percent State, expenditures are generally expressed in terms of the total dollar amount with the State expenditure net of the federal match noted in parentheses.

According to Gordon, the State had a revenue shortfall of $500 million dollars in fiscal year 2008 and $56.4 million the first month of FY2009 of the budgeted projections. In Gordon's estimation, the second month of fiscal year 2009 is expected to be $85.5 million short of the budget projections. According to Gordon, the Governor has issued budget limits and spending cuts under which TennCare must return a total of $64 million of its FY2009 budget appropriation to the State as well as an additional three percent reduction for FY2010. Gordon explains that the Tennessee's Constitution requires a balanced budget, so deficit spending is not an option in Tennessee for the prior funding levels for PDN and HH benefits, or any other program, citing Tenn. Const. art. II, § 24. Id. at p. 5.

In Gordon's opinion, if the PDN and HH benefits limits are not cut, TennCare will have to make an upward adjustment of nearly $250 million (over $90 million State) for FY2009. To avoid this, the Defendants submitted a proposal to CMS requesting a revised benefit package comparable with other southeastern States. TennCare proposed revision established weekly limitations on HH services and limiting the PDN benefit to technology-dependent adults. The limits do not affect children under the age of 21. TennCare will continue coverage of PDN for adults patients who either: (1) are ventilator dependent for at least 12 hours per day, or: (2) have a functioning tracheotomy requiring suctioning and who need other specified types of nursing care. Around-the-clock care is limited for those technology-dependent individuals who would require the most expensive car, if placed in an institution. Id. at p. 10.

For HH benefits, adult patients who qualify for Level 1 nursing home care are eligible for up to 35 hours of home health care per week, of which no more than 27 hours can be nursing

27

hours.[4] Patients who qualify for Level 2 nursing home care may be able receive up to 40 hours of HH care per week, of which no more than 30 hours can be nursing hours. Eligible enrollees can receive more than 1,000 visits per year (and up to three HH visits per day - two by a HH aide and one by a HH nurse) The HH benefits limits considered the cost of nursing home care. The State's cap of 35 hours a week applies to everyone, regardless of age, including persons over 65.

Historically, 98 percent of Tennessee's expenditures were to nursing home's and two percent were for home and community based services. Prior to 1999, Tennessee did not expend funds for a personal care option In 1999, after the Supreme Court decision in <u>Olmstead v. L.C.</u>, 527 U.S 581 (1999), Tennessee spent $720 million and ranked number 18 nationally with a patient per diem expenditure of $127.80 in 1999 In 2003, in an agreed order, State agreed that to work with the Plaintiffs in an action in this Court to improve the home health services for TennCare enrollees and to develop home and community-based alternatives to nursing home placement. In terms of current per capita expenditures for nursing homes, Gordon ranks Tennessee within the top five or top ten of all States In fiscal year 2007, Tennessee spent $1,182,654,826 on nursing homes that includes certified public expenditures and $943,049,751 in the prior year and in 2005, $906 million. Tennessee expends $192.09 per person in a nursing home Tennessee has some of the highest overall expenditures in the country for institutional care Florida spent $131 and Georgia $86. The occupancy rate in Tennessee's nursing homes is proximately 87 to 88 percent. In Tennessee, the reimbursement system pays a maximum of

---

[4]Level 1 nursing care is provided to individuals who primarily require assistance with activities of daily living, while Level 2 nursing care is provided to those with more intensive nursing needs such as ventilator care, enternal tube feeding, total parental nutrition, peritoneal dialysis, catheter and ostomy care, intravenous fluids administration, and wound care

28

$50,000 to nursing homes that is cost-based reimbursement based upon the 65th percentile of all nursing homes costs. If an individual patient in a nursing home had few medical needs, the State would still pay its per patient costs of $50,000. Yet, in some instances, this limit can increase to $62,275. (Docket Entry No. 23, Defendants' Memorandum at p. 29).

As to the Defendants' comparison of TennCare's home health services to other southeastern states, the Defendants did not include those States' expenditures under personal care option waivers, those States' expenditures under aged/disabled waivers nor those States' expenditures for their managed care waiver programs. The State did consider whether the other states paid for private duty nursing through managed care, as opposed to a state plan. Under Tennessee's home and community based service waiver, the State provides a maximum 1,080 hours of personal care services under the waiver. For the combined federal State expenditures for Medicaid HCBS waiver, Tennessee is in the middle of all States.

TennCare has several waivers plan that serve different types of disabled enrollees: Home and Community Based Services ("HCBS"); Home Health ("HH"); Aged/ Physically Disabled (A/PDH"); Developmentally Disabled ("DD") and Nursing Homes. See Plaintiffs' Exhibit Nos. 12, 25, and 35. Tennessee does not offer a Personal Care Option, as do other states. Plaintiffs' Exhibit No. 25. A comparison of the expenditures on the State's waiver plans from 2002 and 2007, based upon CMS data reveals the following:

|  | 2002 | 2007 |
| --- | --- | --- |
| Aged/ Disabled | $6,102,958 | $16,051,823 |
| Developmentally Disabled | $261,603,425 | $588,568,195 |
| Nursing Homes | $936,533,890 | $1,182,654,826 |

29

Plaintiffs' Exhibit No. 25. In a report issued in December, 2003, John Morgan, the State Treasurer issued a Report on "Serving the Aged and Disabled: Progress and Issues" and found among other things, that "[t]he state has not served any clients through the 1915(c) home and community-based services program, even though the Centers for Medicaid and Medicare (CMS) approved Tennessee's application in May 2002." (Plaintiffs' Exhibit No. 33, at p. I).

As to sources of funds cited by the Plaintiffs to cover these cuts, Gordon explained that the cited TennCare reserve is a non-recurring fund and cannot be a source for recurring expenses. As to the $598,709,60 in the TennCare reserve, the Tennessee legislature has already earmarked $67.1 million for expenses for hospital access, mental health infrastructure, and mental retardation services. TennCare currently has contingent obligations and liabilities of $539,400,000. The State's Rainy Day Fund is not a viable option as Tennessee has already depleted other available reserves and must be available to meet the State's existing budget.

As to the distribution of TennCare funds to providers, TennCare contracts with MCOs that are paid agreed person rates multiplied by the number of persons on the MCO's rolls that was the method for Middle Tennessee in April 2007, for West Tennessee in November 2008, and will be in East Tennessee for January 2009. Gordon describes this method as providing predictability in the budgeting process. Applicable federal regulations require States to pay "actuarially sound" rates, 42 C.F.R. § 438.6(c)(1), meaning that the rates must be actuarially certified as appropriate for the populations and services under the contract. If actual expenses differ from projections, retroactive adjustments are paid to the MCOs. For the period of April 2007 to March 2008, TennCare paid $93 million ($33.8 million State) in retroactive payments.

30

Defendant assert that the total cost of providing health care to the 22 Plaintiffs here was $4,129,300 in FY2008. Of this amount, $3,930,100 was for HH and PDN, while only $41,200 was expended for HCBS services provided through the State's HCBS waiver program and $20,600 for long-term care.

According to Plaintiffs, the weighted average cost for care in a Level 1 nursing home is $50,780 per patient per year, and the weighted average cost for care in a Level 2 nursing home is only $55,250 per patient per year. The savings from implementing the HH and PDN limits are being used to fund other Medicaid programs.

### Dr. Wendy Long-Program Issues

Dr. Wendy Long, TennCare's Chief Medical Officer, explained that in 2004, the Tennessee General Assembly redefined medical necessity under the TennCare program that conflicted with the Consent Decree in Newberry v. Goetz, Civil Action No. 3:98cv1127, Docket Entry No. 334, Order, but the Court modified the decree to conform the two documents. (Plaintiffs' Exhibit No. 59). In 2006, TennCare enacted rules that provide for coverage of a particular benefit only if the service is "medically necessary." Rule 1200-13-16-.05(1). To be "medically necessary," a medical item or service must satisfy each of the following criteria:

1. It must be recommended by a licensed physician who is treating the enrollee or other licensed healthcare provider practicing within the scope of his or her license who is treating the enrollee;
2. It must be required to diagnose or treat an enrollee's medical condition;
3. It must be safe and effective;
4. It must not be experimental or investigational; and
5. It must be the least costly alternative course of diagnosis or treatment that is adequate for the enrollee's medical condition."

Id.

31

Dr. Long asserts that the TennCare medical necessity rule has been ineffective in reigning in the overutilization of HH/PDN services, but those reasons lack any empirical study that the approved medical care was not justified. As discussed below, the fifth component of this regulation, the adequate medical care element, was abandoned. According to Dr. Long, under the revised version of this regulation, 1,000 adult enrollees were receiving amounts of HH/PDN that did not appear on the surface to be the least costly alternative, and only 90 cases made it through the entire fifth prong process through late October 2008. Dr. Long conceded that the defendants did not conduct any studies for its standardized cap on the amount of actual time people might need for home medical care services.

With the new cuts, to control costs, Dr. Long instructed the MCOs not to apply the fifth prong of the medical necessity definition to requests for HH and PDN. Dr. Long wrote a letter to physicians and advised them as follows:

> It is critical that you work with your patients who are receiving amounts of care in excess of the limits to determine the best course of action which may include:
>
> 1. A new order for an amount of home health that is covered by TennCare
> 2. A continued order for the same amount of home health, with the understanding that the patient will be financially liable for amounts of care exceeding the limits.
> 3. An order for nursing home care, if you and the patient/patient's family believe this is needed.

(Docket Entry No. 40, Long Declaration, attachment thereto, Exhibit A). Dr. Long admitted that her letter asked the doctors to issue a new order for the amount of benefits covered by TennCare. Dr. Long's letter did not refer to whether the order would meet the patient's needs and reflects that under the new cuts, TennCare's services for the disabled are not based upon medical standards, but financial standards.

32

As to the caps, Dr. Long asserts that in TennCare's experience, with the revised cuts, "the vast majority of [enrollees] will unlikely to require nursing home care" and will retain "wrap around" support from family members and/or other non-paid caregivers (Docket Entry No. 40, Long Affidavit at p. 13). Dr. Long has not assessed the actual availability of family assistance for all affected enrollees, but of the 1,000 enrollees reviewed, 581 enrollees remained at home with the reduced care level and family assistance. Id at p 13. Yet, there is not any proof to determine if Dr. Long's survey is statistically reliable nor that the evaluation of this reduced level of care met the enrollee's needs or how the cuts affected the enrollee's health. Dr. Long's observations on family support are contradicted by the Plaintiffs' proof on the absence of family support for their needs, if these cuts are implemented

According to Dr Long, "[f]or those few enrollees who do require nursing home care, the facilities available in Tennessee will be able to safely provide for their health needs." Id at pp. 18-19 Tennessee has two levels of nursing home care, Level 1 care primarily provide home health aides rather than a nurse. Level 1 nursing homes also provide "administration of oral medications, ophthalmics, otics, inhalers, subcutaneous injections, topicals, and suppositories, oxygen administration, nebulizer treatments, routine catheter, bowel and ostomy care and routine nursing observation and assessment." Id at p. 19. Based on her review of some of Plaintiffs' records, Dr Long opines that 10 Plaintiffs will receive either nursing care or a combination of HH aide and nursing care require nursing services that are routinely provided in Level 1 nursing facilities." Id.

Level 2 nursing home care provides skilled nursing care, including "gastostomy tube feeding, sterile dressings for Stage 3 or 4 pressure sores, total parenteral nutrition, management of unstable blood sugar with sliding scale insulin, intravenous fluid administration, peritoneal dialysis,

33

nasopharyngeal and tracheostomy suctioning (when suctioning is required multiple times each shift) and ventilator services." Id at p. 20 Three Plaintiffs appear to qualify for Level 2 care with two Plaintiffs likely requiring care in a specialized respiratory unit of a nursing home and will be eligible to receive private duty nursing as a cost effective alternative to nursing home care

Dr. Long states that a state agency investigates complaints about nursing facilities and that agency has not received any complaints regarding any of Plaintiffs' allegations. Plaintiffs submitted a national study that included among other data, the percentages of deficiencies in Tennessee nursing homes in 2007 Of particular note, 23.5% of Tennessee nursing home had deficiencies in "Incontinence/Urinary Care" and 18.4% had deficiencies in "Infection Control". (Plaintiffs' Exhibit No. 23 at p. 84)[5]

As to the Plaintiffs' complaints about nursing homes, Dr. Long conducted a paper review of their medical records One Plaintiff complained of developing ulcers, but Dr Long notes that the ulcers did not occur at a nursing home, but at a rehabilitation hospital. Another two Plaintiffs cited fractured hips, but those also occurred while those Plaintiff were under private duty nursing care. Dr Long cited another Plaintiff who was hospitalized, but her doctor recommended a nursing home upon discharge and a consulting physician recommended against home confinement Dr. Long also noted some periods of time when the patient was asleep while the CNA was present, but there is not any extensive review to determine if the cited instances are representative of the patients' total experiences.

Rhonda Smith is a Staff Education/Authorization Nurse with Quality Private Duty Care, that provides home health services to both private pay and TennCare patients in Jamestown and Fentress

---

[5] A recent report is that a CMS study ranked Tennessee's nursing homes 47th among the States. The Tennessean, December 18, 2008 at p 1.

County, Tennessee. (Docket Entry No. 52 at ¶¶ 1-2). According to Smith, "Dr. Long misstates the process by which Quality Private Duty Care was compelled to obtain new doctors' orders for our home health patients". Id. According to Smith,

> We were instructed by Amerigroup to work with our TennCare home health patients to obtain doctors orders that were within the new TennCare limits.
>
> For many of our patients, this meant Quality Private Duty Care asking the doctor to change his order from 24/7 home health care to 35 hours per week at home health care
>
> It has never been our policy to tell doctors to change their orders based upon an insurance coverage policy. We serve private pay patients whose orders exceed that which their health insurance plan actually covers. In those cases, we do not ask doctors to change orders to coincide with the coverage limits
>
> We would have provided our TennCare patients at least the amount of care covered by TennCare under the new limits (for example 35 hours per week), even if the doctor's order was for more than that amount, as long as we had authorization from the MCO.

Id. at ¶¶ 4-8. Tamara Watson, the Director of Cumberland River Homecare in Celina, Clay County, Tennessee, a provider of home health services to both private pay and TennCare patients, corroborates Smith's assertion that Dr. Long "misstates the process . . . to obtain new doctors' orders for home health patients." (Docket Entry No. 53, Watson Declaration at ¶¶ 1-2).

### Tennessee's Long Term Community Care Act

Effective July 9, 2008, the General Assembly of Tennessee enacted the "Long-Term Care Community Choices Act of 2008" and made the following findings:

> WHEREAS, in Tennessee, the current long-term care system for persons who are elderly and/or adults with physical disabilities is fragmented, with access to the various types of long-term care services scattered across different points of entry with no coordination between services, making it difficult for people who need care and their families to understand their options, make informed decisions, and access services in a timely manner; and

35

WHEREAS, people who need long-term care and their families have little opportunity to exercise any choice of decision-making with respect to the types of long-term care services they need and who will provide them; and

WHEREAS, the current long-term care system is heavily dependent on the most costly services with 98 percent of long-term care funding spent on institutional care and limited utilization of lower cost home and community-based options even though such options would better meet the needs and preferences of people who need care and their families ....

Tenn. Public Acts, Chapter No. 1190 at p. 1.

Of particular significance here, this Act authorizes the Plaintiffs to receive TennCare

funding to effect their own home health care plan, including the hiring of a family member or

friend at their residence or in a community setting.

(c) Notwithstanding any provision of law or rule to the contrary, a competent adult with a functional disability living in his or her own home or a caregiver acting on behalf of a minor child or incompetent adult living in his or her own home may choose to direct and supervise a paid personal aide in the performance of a health care task.

(d) For purposes of this section, a competent adult is a person age 18 or older who has the capability and capacity to evaluate knowledgeably the options available and the risks attendant upon each and to make an informed decision, acting in accordance with his or her own preferences and values. A person is presumed competent unless a determination to the contrary is made.

(e) For purposes of this section, a caregiver is a person who is (1) directly and personally involved in providing care for a minor child or incompetent adult; and (2) is the parent, foster parent, family member, friend or legal guardian of such minor child or incompetent adult.

(f) For purposes of this section, a person's home is the dwelling in which the person resides, whether the person owns, leases, or rents such residence, or whether the person owns, leases, or rents such residence, or whether the person resides in a dwelling owned, leased, or rented by someone else. A person's home may include specified community-based residential alternatives to nursing facility care as promulgated in rules and regulations by the commissioner, but shall not include a nursing facility or assisted-care living facility setting.

36

(g) For the purposes of this section, a paid personal aide is any person providing paid home care services, such as personal care of homemaker services, which enable the person receiving care to remain at home whether such paid personal aide is employed by the person receiving care, a caregiver, or by a contracted provider agency that has been authorized to provide home care services to that person

Id, at Section 15 (c) through (g).

Gordon conceded that the State's recently enacted Long -Term Care Community Choices Act of 2008, allowed qualified persons to elect to remain at home for health care services and to promote independence, choice, dignity, and quality of life based upon their decisions, not those of the State The Governor's press release on that Act, Plaintiffs' Exhibit Number 65, describes consumers' choice as a option under the Act, including nursing homes. Once operational, the Act authorizes grants to a qualified individual for the amount of that consumer's elected service. CMS must approve these initiatives, but the record is unclear on the status of such approval In any event, TennCare will continue to contract with managed care organizations to coordinate a citizen's care

As an example, Berry's MCO determined that Berry needed 24/7 care. Yet, in Berry's view, he could live with only 16 hours a day Another Plaintiff testified that the MCO provided her a private duty nurse when a CNA would have been sufficient. Under this new Act, Berry would determine that he needed only eight hours in the morning and eight hours at night and hire his own worker for those hours. Berry could also request his MCO to change his hours to fit his schedule

## B. Conclusions of Law

In enacting the ADA, Congress made certain findings: "(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms

37

of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization ... (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, ... failure to make modifications to existing facilities and practices, ... [and] segregation ... " 42 U.S.C. §§ 12101(a)(2), (3), (5). In the ADA, Congress declared that "segregation" of persons with disabilities is a "for[m] of discrimination," and that such discrimination persists in the area of "institutionalization." 42 U.S.C. §§ 12101(a)(2), (3), (5).

Title II protects "qualified individual[s] with a disability" who are "subjected to discrimination." 42 U.S.C. § 12132. "Qualified individuals," under the ADA are persons with disabilities who, "with or without reasonable modifications to rules, policies, or practices, ... mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The ADA applies to "any State or local government," and "any department, agency, [or] special purpose district," 42 U.S.C. §§ 12131(1)(A), (B), and prohibits denial of "the benefits of the services, programs, or activities of a public entity, or [to] be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The ADA designated the Attorney General to promulgate regulations to enforce the ADA. Among those regulations is the "integration mandate regulation," that provides: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d) (1998). The preamble to these regulations defines "the most integrated setting appropriate to the needs of qualified

38

individuals with disabilities" as, "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR § 35, App A, p. 450 (1998) Moreover, the ADA regulations provide that:

> "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

28 CFR § 35 130(b)(7) (1998)

### 1. Standing

As a threshold issue, the Defendants contend that the Plaintiffs lack standing to enforce these regulations under the ADA. The Defendants rely upon the rationale of <u>Alexander v. Sandoval</u>, 532 U.S 286 (2001), which involved Title VI of the Civil Rights Act and held that "a failure to comply with regulations promulgated under [a statute] that is not also a failure to comply with [the statute itself] is not actionable."

The Supreme Court has held that a private right of action exists under Title 11 of the ADA, and Section 504 is enforceable. <u>Barnes v. Gomn</u>, 536 U.S 181, 185 (2002) (citing <u>Olmstead</u>, 527 U.S at 600 and 42 U.S.C § 12010(a)(2), (a)(5)). In <u>Bd. of Trustees of the Univ. of Alabama v. Garrett</u>, 531 U.S 356, 374 n. 9 (2001), the Supreme Court expressly recognized the right of a private plaintiff to assert an ADA claim for injunctive relief against a state official in federal court. Other Circuits and district courts disagree about whether <u>Sandoval</u> applies to the ADA mandate regulations. <u>Penn. Prot. & Advocacy Inc. v. Penn. Dep't of Public Welfare</u>, 402 F 3d 374, 379 (3d Cir 2005) (enforcing ADA and RHA integration mandate regulations); <u>Radszewski v. Maram</u>, 383 F.3d 599, 615 (7th Cir. 2004). In <u>Frederick L. v. Dep't of Public Welfare</u>, 157 F.Supp.2d 509, 536 (E.D. Pa. 2001), that District Court held:

39

> The ADA, like section 504 and unlike Title VI, prohibits disparate-impact
> discrimination. The Defendants would be correct if the integration mandate required
> action or inaction beyond what is required by the statute itself. That is not the case
> here. The ADA regulations at issue here are merely rules for the implementation of
> the statutory directives; they do not prohibit otherwise permissible conduct.

Id. at 529 (emphasis added). Congress designated the Attorney General to enforce the ADA and

the Attorney General advocates for an implied right of action under the ADA. See Docket Entry

No. 27, Exhibit A thereto, Brief of the United States in a Florida action.

The Court concludes that under these precedents on the ADA and RHA, the Defendants'

contention that Plaintiffs lack standing under the ADA and RHA lacks merit.

### 2. Plaintiffs' Institutionalization Claims

In Olmstead, the Supreme Court addressed "whether the proscription of discrimination may

require placement of persons with mental disabilities in community settings rather than in

institutions. The answer, we hold, is a qualified yes. Such action is in order when the State's

treatment professionals have determined that community placement is appropriate, the transfer

from institutional care to a less restrictive setting is not opposed by the affected individual, and the

placement can be reasonably accommodated, taking into account the resources available to the

State and the needs of others with mental disabilities." 527 U.S. at 587. The Supreme Court also

held, "Unjustified isolation... is properly regarded as discrimination based on disability. But we

recognize, as well, the States' need to maintain a range of facilities for the care and treatment of

persons with diverse mental disabilities, and the States' obligation to administer services with an

even hand." Id. at 597. Yet, the "States must adhere to the ADA's nondiscrimination requirement

with regard to the services they in fact provide." Id. at 603.

40

In deciding this issue, the Supreme Court described the adverse effects that occur with a State's institutional placement of persons with qualifying disabilities

> First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life . . . Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment. . . . In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice

Id. at 600-01.

The Court concludes that Plaintiffs' proof establishes that as persons with disabilities, the Defendants' new benefits cuts for home health services will cause their institutionalization into nursing homes. Here, the Defendants' cuts will eliminate services that enable Plaintiffs to remain in their community placement. The Defendants previously determined that Plaintiffs' community placement was medically necessary and was the least costly method to deliver such services. Plaintiffs' proof is that the Defendants are now forcing Plaintiffs into nursing homes without any mechanisms to determine whether their medical needs can be met in the community or the nursing home. Plaintiffs' physicians and other health care providers describe the Defendants' cuts as forcing these Plaintiffs into nursing homes that would be detrimental to their care, causing, inter alia, mental depression, and for some Plaintiffs, a shorter life expectancy or death. This categorical approach is to reduce the demand side of the community services market without any efforts to adjust the supply side of the home services market (where the MCOs are generating administrative costs that represent half of the Plaintiffs' health care costs), and without individual evaluations of Plaintiffs' actual medical needs.

41

For these Plaintiffs, the isolating and deleterious effects described by the Supreme Court in Olmstead are present: loss of individual lives, community activities and separation from their communities and loved ones. Plaintiffs' treating physicians attest to these adverse effects if Plaintiffs' current home care services are so drastically cut. Moreover, as the Supreme Court stated: "[I]nstitutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Olmstead, 527 U.S. at 600. Reduced benefits are not based on a standard of adequate medical care, but solely on fiscal considerations. Dr. Long's general references that nursing homes can provide adequate care based upon paper review of Plaintiffs' medical record and the limited survey of enrollees is insufficient. Under the ADA, "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference." Id. at 610 (Kennedy, J., concurring).

With Defendants' current cuts, these Plaintiffs would also be deprived of their individual choices that the 2008 Long-Term Community Care Act grants them. For example, Berry and Adams need 16 to 24 hours of services, and those Plaintiffs could each receive up to $62,275 in State funds that represent the cost of nursing home cost for a year. Both of these Plaintiffs cite the need for only a CNA whose pay ranges from $9 to $11 per hour. At these rates, these Plaintiffs could hire a CNA to provide home health care for 6,889 hours that for 20 hours per day would cover 344 days.

Circuit and district courts have held that the fact that increased State expenditures may be necessary to provide home medical services and accommodations required by the ADA and RHA does not automatically bar relief under these Acts. Radaszewski, 383 F.3d at 613-15; Frederick L.

42

v. Dep't of Public Welfare, 364 F.3d 487, 500 (3rd Cir. 2004); Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1182-83 (10th Cir. 2003); Townsend v. Quasim, 328 F.3d 511, 516-20 (9th Cir. 2003); and Makin ex rel. Russell v. Hawaii, 114 F.Supp.2d 1017, 1034 (D. Haw. 1999). As the Third Circuit stated, "if the District Court opinion is read as focusing only on immediate costs [of community medical care], as Appellants contend, it would be inconsistent with Olmstead and the governing statutes." Frederick L., 364 F.3d at 495. The Third Circuit also observed, "The [Fisher] Court has reviewed the legislative history of the ADA and concluded that Congress contemplated that states sometimes would be required to make short-term financial outlays, even in the face of mounting fiscal problems." Id. (citing Fisher, 335 F.3d at 1183). The Third Circuit has also held that:

> [a] state cannot meet an allegation of noncompliance simply by replying that compliance would be too costly or would otherwise fundamentally alter its noncomplying programs. Any program that runs afoul of the integration mandate would be fundamentally altered if brought into compliance. Read this broadly, the fundamental alteration defense would swallow the integration mandate whole.

Penn. Prot. & Advocacy, Inc. v Penn. Dep't of Public Welfare, 402 F.3d 374, 381 (3d Cir. 2005).

The Court concludes that these decisions reflect that the controlling issue requires an analysis of the effect of the relief sought by the Plaintiffs on TennCare's other programs for disabled persons and whether such effects would fundamentally alter the TennCare program for disabled persons.

### Fundamental-Alteration Defense

Defendants assert the fundamental-alteration defense that the Plaintiffs' relief, if granted, would fundamentally alter the TennCare program, and therefore, with the State's comprehensive

43

plan for community health services, the Court must defer to the Defendants' decision on these benefits cuts

The fundamental alteration defense arises under the ADA regulation, 28 C.F.R. §35.130(b)(7). In Olmstead, the Supreme Court stated:

> Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

527 U.S. at 604.

Here, there are only twenty-two (22) Plaintiffs and the funds for their home care services will be only a fraction of the $50 million that Defendants identify as necessary for the changes Tennessee proposes. (Docket Entry No.27, Defendants' Memorandum at p.19). In measuring the impact of the Plaintiffs' relief for the defense, the Court must compare the impact of the relief sought by the named Plaintiffs to the overall cost of the State's programs similarly situated enrollees: "If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail. Id. at 603. Thus, where:

> the District Court compared the cost of caring for the plaintiffs in a community-based setting with the cost of caring for them in an institution ...a comparison so simple overlooks costs the State cannot avoid; most notably, a "State ... may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions."

Id. at 604

44

Thus, in considering Plaintiffs' cost arguments, this Court must consider the financial

impact of providing PDN and HH benefits not only to Plaintiffs, but also to the substantially

similar enrollees receiving home health care prior to the implementation of the Defendants' cuts.

In Frederick L., the Third Circuit explained that "Olmstead lists several factors that are relevant to

the fundamental-alteration defense, including but not limited to the [1] State's ability to continue

meeting the needs of other institutionalized mental health patients for whom community

placement is not appropriate, [2] whether the State has a waiting list for community placements,

and [3] whether the state has developed a comprehensive plan to move eligible patients into

community care settings." 364 F.3d at 495 (citing Olmstead, 527 U.S. at 605-06)

In Radaszewski, where the plaintiff was a minor who required 24/7 coverage at a cost of

$15,000 to $20,000 month for home medical care, the Seventh Circuit defined the appropriate cost

comparison.

> **A court must therefore take care to consider the cost of a plaintiff's care not in
> isolation, but in the context of the care it must provide to all individuals with
> disabilities comparable to those of the plaintiff...with similar needs**    If the State
> would have to pay a private facility to care for Eric, for example, and the cost of that
> placement equaled or exceeded the cost of caring for him at home, then it would be
> difficult to see how requiring the State to pay for at-home care would amount to an
> unreasonable, fundamental alteration of its programs and services.

383 F.3d at 614 (emphasis added).

In Fisher, the Tenth Circuit rejected the state's fundamental-alteration defense, stating that

Oklahoma's fiscal problems did not establish a per se fundamental-alteration defense because "[i]f

every alteration in a program or service that required the outlay of funds were tantamount to a

fundamental alteration, the ADA's integration mandate would be hollow indeed." 335 F.3d at

1183  The Third Circuit held that "states cannot sustain a fundamental-alteration defense based

45

solely upon the conclusory invocation of vaguely-defined fiscal constraints." Frederick L., 364
F.3d at 496 (citing Makin, 114 F.Supp.2d at 1034). In Makin, Hawaii invoked the
fundamental-alteration defense, contending that increasing community placements would violate
state and federal funding limits and change its existing programs with "unlimited" state funding
for community mental health services. 114 F.Supp.2d at 1034. The district court rejected that
defense, reasoning that a potential funding problem, without more, would not establish the
fundamental-alteration defense. Id.

    As applied here on the first Olmstead factor, the Defendants have not shown that the
expenditures of home health services threaten similarly disabled persons in nursing homes. The
enrollees in nursing homes are similar because to qualify for home care services under this waiver,
the enrollee must be eligible for a nursing home. As found earlier, TennCare overwhelmingly
relies on nursing homes. In 2007, TennCare spent about $1.2 billion dollars on nursing homes.
Defendants concede that some enrollees will have to go into nursing homes, but agree their
benefit cap limit "should not significantly increase the use of nursing home care for persons who
have been receiving PDN or HH benefits." (Docket Entry No.27, Defendants' Memorandum, p.
at 24)

    As to the second factor, the new state law may create a waiting list for community health
services for 2000 persons, but that Act has not been implemented to establish the extent of
consumer demand for home health care under that statute and at rates set by the Defendants. The
Plaintiffs' proof is that with the structure of the TennCare program, such services cannot be
provided at those rates.

46

As to the third factor, "whether the State has developed a comprehensive plan to move eligible patients into community care settings," Frederick L., 364 F.3d at 495 (citing Olmstead, 527 U.S. at 605-06), the Olmstead plurality provided a specific example of the limited reach of the integration mandate:

> If, for example, the State were to demonstrate that it had a comprehensive, **effectively working plan** for placing qualified persons with . . . . disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

Id. at 498 (quoting 527 U.S. at 584) (emphasis added).

The Defendants' "comprehensive plan" is the State's Long-Term Care Community Choices Act of 2008. Yet, defense counsel conceded that this Act is not operational and lacks any projected date for implementation as well as CMS's approval. For the fundamental-alteration defense, a state must show that the plan "demonstrates a reasonably specific and measurable commitment to deinstitutionalization for which [it] may be held accountable." Frederick L. v. Dep't of Public Welfare, 422 F.3d 151, 157 (2005). The measures that the Defendants identify, including the phasing-in HCB waiver slots and effective home and community-based alternatives to institutional care - are all promissory. The new waiver slots would not be phased in until February of 2009. (Docket Entry No. 23, Defendant's Memorandum, at p 14). Further, Tenn Code Ann § 71-5-1404(a) requires that "[t]he commissioner shall develop and implement a statewide fully integrated risk-based long-term care system" and shall rebalance "[t]he long-term care services by expanding access to and utilization of cost-effective home and community-based alternatives to institutional care " There is not any evidence of a draft of a plan as required by this

law. For the same reasons stated on the second factor, it is unclear to the Court this Act can be deemed effective given these circumstances as well as TennCare's structure and past performance.

Here, the Court concludes that the "Defendants have not demonstrated that they have a comprehensive effectively working plan for placing qualified persons with mental disabilities in less restrictive settings". Frederick L., 364 F.3d at 500. At this stage of the proceedings, the Court is not persuaded that this new Act will be effectively implemented. Prior to these current cuts, the Defendants did not conduct comprehensive individual assessments to determine whether Plaintiffs will have to go into institutions or whether they can be adequately cared for in the community. Moreover, Defendants cite only "the potential for more efficient and cost-effective care" sometime in the future (Docket Entry No. 23 at p. 27). "[V]ague assurance of . future deinstitutionalization" does not establish an acceptable plan. Frederick L., 422 F.3d at 156.

As an example of a comprehensive working plan, in Sanchez v. Johnson, 416 F.3d 1051 (9th Cir. 2005), the Ninth Circuit found an effectively working plan where: (1) a 30 year old state law required coverage of services for people with developmental disabilities to prevent or minimize institutionalization; (2) a significant decrease in institutionalized individuals occurred over a decade; (3) the State significantly increased community based spending, home and community based waiver slots over the course of a decade; (4) the State had a system of individualized community placement plans with extensive databases containing disabled citizens in the system. Id. at 1064-66. In Arc of Washington v. Braddock, 427 F.3d 615, 621 (9th Cir. 2005), the HCB waiver program had increased more that 600 percent and the State doubled the budget for community-based programs, and had a 20 percent reduction in its institutionalized population. In Frederick L., the Third Circuit rejected Pennsylvania's deinstitutionalization plan

48

for lack of time frames for patients' discharge from institutions, the lack of criteria of eligibility for discharge as well as the absence of defined arrangements with local authorities for housing, transportation, care and education to effectuate the disabled person's integration into the community. 422 F.3d at 160

Without a plan for implementation of the LTCCC, the Court concludes that the Defendants lack a cognizable comprehensive plan and in effect, the Defendants' lack of implementation has had the reverse effect to institutionalize these Plaintiffs and deny them the individual choice that the new state law provides. In this context, the reduction of services to add enrollees for inadequate services is not an effective plan.

The Defendants cite the Sixth Circuit precedent that the Court cannot grant relief for continued benefits in a similar context:

> When a State to its credit achieves the status of becoming one of the most generous providers of Medicaid services in the nation, it may occasionally happen that the zero-sum fiscal realities of administering a state budget will prohibit the State from sustaining that level of support. If that should happen, **it is not for the federal courts to compel the State to maintain non-mandatory Medicaid programs that it can no longer support.**

Rosen v. Goetz., 410 F.3d 919, 933 (6th Cir 2005) (emphasis added)

As to the latter, in Rosen, this Court did not require spending the State could not afford, but instead limited the State's spending to the level the State selected. Rosen v. Goetz, 3:98-0627 (Docket Entry No. 748, Order at p. 4) As to the former statement in Rosen, the Plaintiffs' proof casts serious doubts on the Defendants' comparison of Tennessee's waiver benefits to other southeastern states' benefits. Other states' waiver plans with similar services were not counted. In addition, as the State Treasurer found in 2003, despite receipt of federal waiver funds in 2002, the Defendants did not provide home health services to the disabled and elderly that year.

49

## Preliminary Injunctive Relief

On the award of preliminary injunctive relief, the court must consider four factors: (1) likelihood of Plaintiffs' success on the merits; (2) any irreparable harm to the Plaintiffs; (3) any adverse effect on other parties or persons; and (4) the public interest. See Gonzales v. National Bd. of Med. Exam'rs, 225 F.3d 620, 632 (6th Cir. 2000).

For the reasons stated above, the Court concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits of their claims that the Defendants' drastic cuts of their home health care services will force their institutionalization in nursing homes. This is based upon the proof, including Plaintiffs' health care providers that such institutionalization will cause Plaintiffs to suffer injury to their mental and physical health, including a shortened life, and even death for some Plaintiffs. That proof demonstrates irreparable injury.

As to the harm to others, given the limited relief sought by the Plaintiffs, the Defendants would conduct individual assessments for the remaining Plaintiffs; prepare a plan to implement the State's recent home health Act promoting individual choice and control of home health services; and maintain these Plaintiffs' current home health services until the first two conditions are satisfied. These measures do not harm others as this remedy is consistent with state law. The enrollment of others under the recent state law cannot be done until the plan requirements of the Act are met. The public interest is served by the enforcement of the ADA and the RHA, as found by other courts. See e.g. Fisher, 335 F.3d 1175, 1180; Heather K. v. Mallard, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995).

For the above stated reasons, the Court concludes that the Plaintiffs' 'motion for a preliminary injunction should be granted.

An appropriate Order is filed herewith.

Entered this the _18_ day of December, 2008.


_____

WILLIAM J. HAYNES, JR.
United States District Judge

Case 3:08-cv-00939  Document 77  Filed 12/19/08  Page 51 of 51 PageID #: 1102